IRWIN P. WOLFINGER, appellant,

*v.*

DORA McFARLAND, individually and as executrix of William McFarland, deceased, et al., respondents.

[Argued March 7th and 8th, 1904.   Decided June 20th, 1904.]

1. Where all the proof leaves it in doubt whether an alleged agreement to convey lands was an obligatory contract or a declaration of a purpose to confer a benefit, specific performance will not be decreed.

2. All the terms of the alleged parol contract must, in cases where specific performance is sought, be proven by the complainant with definite certainty or it will be refused.

3. The complainant claimed to have a parol contract whereby a decedent had agreed to convey to him certain lands used for a foundry. The decedent devised those lands in fee to his widow, who had no notice of the complainant's parol contract. The complainant persuaded the widow to continue the foundry business on the lands in question as owner thereof, to employ him as manager of the business for a long term, and to spend money in its conduct, without disclosing to her that he had any parol contract for the conveyance of the lands to him.—*Held*, the conduct of the complainant above recited estops him from afterwards asserting his parol contract against the widow.

On appeal from a decree advised by Vice-Chancellor Grey, who filed the following opinion:

The bill of complaint in this cause is filed by Irwin P. Wolfinger to enforce the specific performance of a contract which, it is alleged, one William McFarland made in his lifetime with the complainant, to convey a foundry property and its equipment, situate in Trenton, New Jersey, to the complainant, together with an accounting for the profits of the foundry business since the death of McFarland. The defendants are the widow of McFarland, who is executrix and sole devisee in his will, the next of kin and heirs of McFarland, and also Ellis R.

Meeker, a lessee, who since the death of McFarland has received a lease of the premises in question.

The bill alleges that in 1886 McFarland was carrying on the foundry business and had the complainant in his employ as a moulder, paying him as wages $15 per week, and that McFarland then agreed with the complainant that if the latter would remain in his employ he "would pay to the complainant the wages he was then receiving and would increase them from time to time as he might be able and at his death would give his foundry business with all tools, machinery, appliances, appurtenances and everything belonging thereto or used in connection therewith to the complainant absolutely."

The bill alleges that afterwards McFarland moved his foundry to another site, at the corner of Breunig avenue and Mead street (described by metes and bounds in the bill), and that the agreement between the complainant and McFarland was renewed that in consideration that the complainant would serve the best interest of McFarland in the foundry business as long as he should live, he (McFarland) would convey to the complainant the Breunig avenue and Mead street foundry lot and its equipment in addition to any other compensation which he might receive.

The bill alleges performance by the complainant of his part of this contract.

The bill admits that the complainant received from McFarland constantly increasing compensation as wages for his services; that in 1886 it was $16 per week; in 1887, $18 per week; in 1889, $20 per week; and from 1898 to the time of McFarland's death, on December 23d, 1900, at the rate of $25 per week.

The bill further alleges that in August, 1899, McFarland executed a will, devising the foundry property and its equipment to the complainant "in recognition of his faithful services in the past and care for my interest." On December 8th, 1900, McFarland executed his last will, and the bill alleges that through undue influence or fraud he attempted to give the foundry property to his widow, Dora McFarland; that this

will was proven before the surrogate of Mercer county on January 9th, 1901, and letters testamentary thereon were issued to the defendant Dora McFarland, as executrix thereof; and that the widow, Dora McFarland, was informed of the alleged contract between the complainant and McFarland; that after McFarland's death the complainant was greatly surprised and disappointed on learning the contents of the will, and being without any position by which to earn a living the complainant, on or about the 14th day of January, 1901, entered into an agreement with the defendant Dora McFarland to manage and operate the foundry for five years at a salary of $1,800 per year; that on April 15th, 1901, Mrs. McFarland leased the premises to the defendant Ellis R. Meeker for the term of five years and put Meeker into possession on the following day against the complainant's protest, and that Meeker took his lease with full knowledge of the complainant's right under the alleged contract; that the complainant has demanded from the devisee and next of kin and heirs of McFarland that they convey the premises in question to him in performance of the contract entered into by McFarland in his lifetime, and that they have refused to make such a conveyance; that he is ready to release Mrs. McFarland from any obligation to employ him under the contract dated January 14th, 1901, and return to her all moneys paid him by her upon terms that Mrs. McFarland and Meeker shall account to the complainant for the profits of the foundry business since McFarland's death.

The bill prays that the defendant may be decreed specifically to perform the agreement between the complainant and McFarland by conveying to the complainant the foundry property and its equipment; that the lease to Meeker may be canceled; that McFarland and Meeker may account for the profits of the business since the death of McFarland; that Mrs. McFarland and Meeker may be enjoined from disposing of the property, and for further relief, &c.

A decree *pro confesso* has been taken against all of the defendants who are heirs and next of kin of the decedent, Mc-

Farland. They appear to have no interest in the suit unless the will should for some reason be declared invalid.

The defendant Dora McFarland, who is the widow of the decedent, McFarland, the executrix of his last will and the sole devisee of the property in question, files an answer to the bill of complaint, denying that McFarland ever made the contract set forth in the bill. She admits that the complainant was in the defendant's employ and in the receipt of wages for services rendered, and that he continued in the service of McFarland to the time of his death; but she denies that the complainant's services were rendered in pursuance of any such agreement as is set forth in the bill; on the contrary, she insists that the wages received by complainant were in full compensation for the work and services by him done and rendered to McFarland. She leaves the complainant to the proof of his allegation that the decedent, in August, 1899, made a will, devising the foundry property in recognition of his faithful services.

The defendant Dora McFarland further admits that the decedent, William McFarland, on the 8th day of December, 1902, made his last will, devising and bequeathing his real and personal property to the defendant Dora McFarland, which will she duly proved on January 9th, 1901, before the surrogate of Mercer county; and that on January 14th, 1901, the complainant entered into the written agreement named in the bill. She alleges that by that contract the complainant undertook to act for her as manager of the foundry business for the period of five years, from January 14th, 1901, at a salary of $1,800 per year; that, with full knowledge of the decedent's will, dated December 8th, 1900, devising the foundry business to her, the complainant thus recognized her as the owner of the foundry and business, and entered into her service as such owner, and conducted and carried on the foundry business for her until April 17th, 1901, receiving wages at the agreed rate named in the contract; that at the last-named date the defendant leased the foundry to Ellis R. Meeker, agreeing with him (Meeker) for the taking over of all contracts

by him relating to the business with the option to purchase the premises.

The answer of the defendant Dora McFarland sets forth the substance of the agreement between her and Meeker, and particularly this clause:

"And this indenture also witnesseth, that for the consideration hereinbefore expressed, the said party of the second part shall and will continue in his employment one Irwin P. Wolfinger, mentioned in a certain writing, dated January 14th, 1901, purporting to be an agreement of hiring between the said party of the first part and the said Irwin P. Wolfinger, subject to the terms thereof (a copy of which the said party of the second part has already seen) until the expiration of the term of service therein in that behalf provided."

The defendant Dora McFarland further alleges, that this agreement was exhibited to the complainant, and that he then availed himself of the benefit of it by entering into Meeker's service to manage for him the foundry and business in the same capacity and on the same terms as the complainant had agreed to work for the defendant Dora McFarland by the contract of January 14th, 1901, and that the complainant continued to work for Meeker, managing said foundry business for him, up to May 13th, 1901, the date of the filing of complainant's bill.

The defendant Dora McFarland insists that the complainant, by his making the contract of January 14th, 1901, to carry on the foundry business for five years as her manager of that business, and by his entering into the service of the defendant Meeker in the same capacity on the same terms, has waived and abandoned any rights, if any he ever had, under the supposed contract with the decedent which the complainant sets up in his bill and which he now seeks to have specifically performed under a decree in this cause.

The defendant Dora McFarland denies the right of the complainant to any relief in equity and prays the same benefit as if she had demurred to the bill of complaint.

The defendant Ellis R. Meeker also answers the bill of complaint. He denies all knowledge of the alleged contract with the decedent McFarland which the complainant seeks to have

specifically performed, referred to in the bill, and charges that there never was in fact any such agreement. He admits the ownership of the foundry by the deeedent, his death, that his will devises the foundry and its equipment to his widow, the defendant Dora McFarland. He alleges that the complainant, after he had knowledge of the decedent's death and that by his will he had given the foundry and business to the widow, contracted with her to manage it for her for five years at an annual salary of $1,800; that learning this and that the will had been proven, the defendant Meeker, on April 17th, 1901, leased the foundry and business from Mrs. McFarland at an annual rental of $3,000 and agreed to continue to employ the complainant according to the terms of his agreement of January 14th, 1901, with Mrs. McFarland. The defendant Meeker denies that his rights in the foundry and business under his lease from Mrs. McFarland are in any way subject to any claim of the complainant; on the contrary, Meeker insists that if complainant ever had any such rights in the premises as he alleges in his bill of complaint, he has by his contract of January 14th, 1901, with Mrs. McFarland acknowledged her to be the owner of the foundry and business, and by his renewal of that contract, accepting employment under Meeker, has acknowledged the efficiency of the latter's lease of the foundry and business from Mrs. McFarland and that the complainant is thereby now estopped to assert his supposed rights in that foundry and business, as he seeks to do by his bill of complaint.

The defendant Meeker amended his answer, reciting the complainant's claim by his bill of complaint that he became entitled to the foundry and business upon William McFarland's death, and that it appears on the face of the bill that since McFarland's death the complainant entered into a written contract with Dora McFarland, who is William McFarland's devisee of that property, whereby the complainant agreed to manage and operate it for the said devisee for the period of five years from January 14th, 1901, which written contract appears to be yet in full force and effect. The defendant Meeker claims that the complainant cannot, in view of these facts, have a decree that

he became the owner of the foundry and business upon McFarland's death, as he prays in his bill, and for this reason the defendant Meeker asks the same benefit as if he had demurred to the bill of complaint.

Issue was joined on these pleadings and the cause came to final hearing on the testimony offered by the respective parties.

The contract which the complainant in this cause seeks to have specifically performed is stated by him in his bill of complaint as follows: He alleges that the decedent, William McFarland, in 1886, agreed with him (the complainant) that if the latter would remain in his employ he would pay the complainant the wages he was then receiving, and would increase them from time to time as he might be able, and at his death would give his foundry business (then carried on upon Taylor street, Trenton) with all tools, machinery, appliances, appurtenances and everything belonging thereto or used in connection therewith to the complainant absolutely; and that afterwards this agreement was renewed and applied to a lot of land, described in the bill by metes and bounds, situate on Breunig avenue, Trenton.

The alleged contract is not claimed to have been reduced to writing. All of the evidence which is offered to show that any contract was ever made consists of the casual parol statements made by the decedent, McFarland, to various persons to whom he talked about his business relations with the complainant. In the absence of proof of an agreement, which would be forceful against the statute of frauds, the complainant alleges that he has fully performed his part of the alleged agreement and is therefore equitably entitled to have those who represent the decedent decreed specifically to perform his part thereof.

No testimony is offered which attempts to directly prove the making of the contract set up in the bill of complaint. Nobody testified that he was present when any such contract was made, either at its inception (in 1886) or at the time of the alleged renewal, applying the contract to the Breunig street property. Some fourteen witnesses testify to statements made by the decedent, McFarland, regarding his business relations with the complainant, and it is these statements of the decedent which

are relied upon to show that any contract ever was made by him with the complainant whereby the complainant was to receive a conveyance of the lands and business in question. None of these witnesses testify that any of these statements of the decedent, McFarland, were ever made to or in the presence of complainant. No two of these witnesses testify with precision to the same statement by the decedent. The language said to have been used by him, as it is repeated by more than two-thirds of the witnesses, is entirely consistent with the declaration of a purpose to make a gift, and does not convey the idea that the decedent declared that he had made a contract. Most of the witnesses testify that the decedent, McFarland, made statements such as these: "He told me at the time that Mr. Wolfinger [the complainant] should get the foundry." "I expect Irv. [the complainant] to succeed me here." McFarland said "He proposed to give that business to Irv." "I have arranged to let Irv. Wolfinger continue the business on his own account." "I am going to give him the foundry." "He had decided to turn over the factory and business to him [Wolfinger] when he was dead." "He had promised Irv. the factory," and the like.

There are, however, several witnesses who testify that the decedent, McFarland, had, in casual conversations with them, made admissions which have color of recognition of a contract between himself and the complainant. The first witness who refers to any admissions of a contract was a man named Lafetra. He testifies that McFarland said "the foundry business here is for Irv., my business manager, but not this, showing me with his finger along in this direction that the new power building didn't go with the foundry building.  *  *  *  He had told me perhaps a dozen times that this property he proposed to give to his business manager for extra services rendered. That is about the way he expressed himself."

These statements of the decedent are rather the talk of an intending benefactor than of a party bound by a contract. But there is a further statement by this witness that in July, 1899, the decedent, McFarland, said to him that there was an agreement "whereby Wolfinger was to have extra compensation.

What that extra compensation was might be construed in a good many ways," &c.

Testimony touching the essential point of the case, which it is declared by the witness who gives it "might be construed in a great many ways," is of very little aid in deciding what the contract in fact was.

A Mr. Pattison testifies to a statement by the decedent, more in the nature of an admission of a contract, in which he said "Wolfinger had made an agreement with him to stay with him as long as he lives to run the foundry, and the foundry and business should be his when he either retired or died."

Mrs. Pattison also testified that McFarland said to her, "I cannot afford to pay Mr. Wolfinger just what I ought to pay him —not just now;" and he said, "We have made an agreement between the two of us that Mr. Wolfinger should have the foundry if anything happens to me, that is the only way I can pay him back for all he has done for me." This language, it is to be observed, is not that of one who feels the obligation of a defined contract, but rather that of a friend who expects to arrange a grateful recognition of kindness received. At a later place in her testimony, in response to the probing of complainant's counsel, the same witness said, "I think I do remember him [McFarland] saying something to me once about Mr. Wolfinger was going to leave him, and he asked him to stay with him, and he said that if he stayed with him the recompense would be the foundry and business—he would repay him in that way if he stayed with him as long as he lived." Another witness, a Mrs. Pancoast, testifies that the decedent said regarding Mr. Wolfinger (complainant) that "if he stood by him the understanding was, that if he would stand by him and live up to his agreement as long as he lived, his foundry property and all pertaining was to be his after he was done with it."

Mr. Pancoast also testified that Mr. McFarland said to him that Wolfinger knew what he was going to get for his services, and that was the foundry, and in fact he took me out and showed me one day what was to be Wolfinger's. He said, "The bargain was, if he [Wolfinger] stayed with him and looked after

the business as long as he lived, everything was to be his when he was done with it. * * * He told me that Wolfinger was to have it for the good work he had done, to pay him. * * * He was to get the foundry and everything connected with it; that was to be his."

These parol statements of the decedent, McFarland, are, it is claimed, admissions of the existence of a contract, which are sufficient to support a decree for the specific performance of the undertaking to convey, set forth in the bill of complaint.

It appears to be an accepted rule that verbal admissions ought to be received with great caution. It frequently happens that the witness, by unintentionally altering a few expressions really used, gives an effect to the statement completely at variance with what the party actually did say. *1 Greenl. Evid.* § 200. Words which are used in a sense expressing grateful appreciation of kindness received, and an intention to requite them, are not admissions of an obligatory contract. A mere promise to confer a benefit, though made in explicit terms, is not a contract. Even if the promisor declares that the in-inducements which led him to make the promise were the valuable services which the beneficiary was rendering him, the transaction is yet not a contract.

Mr. Justice Dixon, speaking for the court of errors and appeals, illustrated this difference in the case of *Eggers* v. *Anderson, 63 N. J. Eq. (18 Dick.) 268.*

In order to prove a contract it must be shown that the parties were mutually bound, each to the other, by consideration moving both ways. To prove an alleged contract for services it is not enough to show declarations by the party receiving them of a purpose to confer a benefit for the services received. A contract must be proven whereby the party doing the services agreed to render them in consideration of values which the other party agreed to give for them.

The witnesses who testified to the above statements of Mr. McFarland, which have some appearance of acknowledgment of a contract, gave no impression in delivering their testimony that they were repeating his words with accuracy. They had no

especial reason to remember the expressions he used. They heard them in mere casual conversations. A very slight change would vitally alter their significance. Their testimony varies from that of the great majority of the witnesses who heard Mr. McFarland speak on the subject of his intentions regarding the foundry. These show that his language was that of one who, without any sense that he had contracted to transfer property in payment for services, yet in grateful recognition of kindly help, proposed to reward a faithful employe by a gift. The complainant's own conduct, which will be hereafter discussed, strongly supports the view that there was no contractual undertaking by Mr. McFarland to give the foundry property to the complainant.

Taking the most favorable view for the complainant, it must be said there is a failure to show, by satisfactory proof, such a contract as will be specifically enforced by decree.

In addition to the doubtful character of that evidence, which comes nearest to exhibiting some contractual undertaking by Mr. McFarland, it does not (when the statements of the different witnesses are compared with each other) show that the terms of the contract alleged to have been admitted by Mr. McFarland were in each instance the same, and in none of them do the terms stated agree with those alleged in the complainant's bill of complaint.

The only attempts to show any written recognition by Mr. McFarland of the alleged contract to convey or devise the foundry business to the complainant are a clause alleged in the bill of complaint to have been part of a will made by Mr. McFarland on May 4th, 1900, "in pursuance of such an agreement and for the purpose of carrying out the same," and a letter written by McFarland. The clause regarding the will is as follows:

"*Eighth.* I do give, devise and bequeath to Mr. Irwin P. Wolfinger, of Trenton, New Jersey, in recognition of his faithful services in the past and care for my interests, the foundry property now owned and operated by me in the city of Trenton, New Jersey, together with the buildings and appurtenances, comprising the six city lots upon which

said buildings are erected, located in the said city of Trenton, and also all the tools and contents of said foundry as the same shall stand at the time of my decease, to him, his heirs and assigns, absolutely."

It is extremely likely (although it was not proven) that Mr. McFarland did, at some time before his last marriage, make some such provision in a will as is above quoted, which he subsequently revoked by a later will, made after his second marriage. But the quoted clause contains no recognition of any contract. Its phrasing is that of one who is making a gift to a faithful servant, not of one who is performing an obligation.

The other written reference is contained in a letter by Mr. McFarland to one William H. Thomas, on December 15th, 1899. In the letter occurs this phrase: "Business is good yet and I have arranged to let Irv. Wolfinger continue it on his own account when I am done with it." Not a word in this letter indicates that the writer was mentioning an arrangement entered into because of any contract to give the business to Wolfinger. The reference is obviously to the whole of the decedent's business, and not to the foundry and its business, which is the present claim of the complainant. It does not even declare a purpose to make a gift of the property to complainant, but simply to permit him to carry on the business on his own account.

The relations between Mr. McFarland and Mr. Wolfinger were such that it may readily be believed that Mr. McFarland, in the statements made by him, referred to an intended disposition of his property which was, in his conception of it, voluntary, and not obligatory. The complainant was his managing foreman. The decedent was paying him wages which had been increased from $15 per week, at the beginning of his employment, to $25 a week during the last two years, with corresponding advancement in the character of the work required. They were upon friendly, almost affectionate, terms. Each expected from the other the most kindly consideration. Neither saw any reason for a hard and fast bargain as to the future, and there is therefore less likelihood that any such bargain was in fact made.

The probability that Mr. McFarland's consideration for the complainant was voluntary and not obligatory, is cogently sup-

ported by the complainant's own conduct, when it was made known to him, after Mr. McFarland's death, that he had by his last will given all his property to his surviving widow. Mr. McFarland died on December 23d, 1900. On the day of the funeral the complainant asked Mrs. McFarland if he should go on with the business at the foundry, and accepted orders from her to go right on with it. About a week after the funeral he asked Mrs. McFarland if she was going on with the business, and accepted directions from her to take charge of it. He suggested to her, as he would have to look after everything now, whether she did not think it was worth more money than he had been receiving. He fixed his own salary, naming to Mrs. McFarland a sum not quite $1,800 a year, and she said "make it $1,800." He declared to her that he would do his best to please her and would keep her posted as to everything that was going on. He said nothing whatever to her intimating in any way that he had any claim to be the owner of the business. Nothing was said about Mr. McFarland's will until about the 14th or 15th of January, 1901, when Mrs. McFarland, having brought it to the office of the foundry, the complainant asked her if she had it, and when told that she had, he said, "Would you mind letting me see it?" The will gave all the decedent's property to Mrs. McFarland, including, necessarily, the foundry and business which the complainant now claims. Upon reading it the complainant said, "Well he has blackballed me; he has forgotten all about me; I thought he would remember me." Mrs. McFarland said, "Perhaps he would have, if he hadn't married again."

At this time the complainant knew by the will itself that Mr. McFarland had disposed of the foundry property as if he were under no contract to convey it to the complainant as compensation for services. With this knowledge before him, the complainant gave no hint by any expression or protest that he ever had any contract with Mr. McFarland that the latter should convey the business to him. On the contrary, the words he used indicated his disappointment, not that the will had

broken a contract, but that the testator had not remembered him as he had expected he would.

From the time of Mr. McFarland's death, on December 23d, 1900, the complainant continued to accept wages from Mrs. McFarland for the conduct of the very business which he now claims the decedent had agreed to convey to him. He knew that Mrs. McFarland, believing herself to be the owner of the foundry and business by the gift under the will, was paying the weekly wages of the men and advancing the money necessary to carry on the business.

This situation of affairs continued until the 14th day of January, 1901. It then came to the complainant's knowledge that different parties were seeking to purchase the foundry and business from Mrs. McFarland, and that her counsel had advised her to give it up. He knew that there was pressure on her to have her sell out and he was afraid that she would do so. He was not content with the verbal assurances of Mrs. McFarland of his continued employment, and wanted a contract in writing that he should be employed for five years. He dictated the terms of such a contract to Mrs. McFarland, knowing that her counsel disapproved of it. She, at his suggestion, wrote the contract and signed it, and he added an acceptance and signed it, and procured witnesses to attest its execution and retained the paper. It is in the following words and figures:

> "TRENTON, N. J., January 14, 1901.
>
> "I do hereby engage Irwin P. Wolfinger to manage and carry on the foundry business for five years at a salary of $1,800 a year.
>
>                         "(Signed)    DORA MCFARLAND.
> "I accept the same.      (Signed)    IRWIN P. WOLFINGER.
> "Witness—    .
>      "D. GRANT FRYE.
>      "LOUIS GERLACH."

On the hearing, strenuous efforts were made by the complainant's counsel to minimize the effect of the making of this agreement, and it has been energetically argued that it has little significance, because made by the complainant in ignorance of his rights and without the previous advice of his counsel. It

may be doubtful whether the advice of his counsel had been received on the subject-matter of this contract prior to its making, but it is impossible to read the cross-examination of the complainant himself on this point without being convinced that this contract was of his own uninvited suggestion, contrivance and procurance. His manner, when testifying as to the drafting and execution of this contract, showed that he sought to convey an impression contrary to the fact as it happened. He induced the widow to make the contract and dominated the whole transaction.

If the agreement to convey set up in the bill of complaint was ever in fact made between the decedent and the complainant, the latter would have disclosed it to Mrs. McFarland before entering into their contract of January 14th, 1901. No advice of counsel was necessary to explain so evident a duty. The complainant, at that time, had known for several weeks that the decedent had by his will given the foundry and business to Mrs. McFarland, and that he had thus, in substance, denied that he had contracted to give them to the complainant. The latter also knew that Mrs. McFarland had accepted the gift, and that she was proceeding to act as owner of the foundry and business, spending money, incurring debts and making contracts in the conduct of its affairs, and he had no reason to believe that she had any knowledge of his alleged claim to the property—in fact, she had no intimation of his claim. The complainant not only kept silence, but he invited her to act as owner by a contract which for five years fixed an obligation upon her as owner, operating in his favor as an employe under her ownership.

The complainant contends that Mrs. McFarland declared that this contract of January 14th, 1901, was made for a purpose, and that her counsel could readily defeat it. There is some testimony on the point, but the impression I have received from all the proofs is that there is not the slightest probability that she ever said anything of the kind. She for a time forgot that she made that contract, but when reminded of its existence by the complainant, who asserted its protecting force, Mrs. McFarland at once acknowledged it. Neither she nor her counsel

ever attempted to defeat it.   On the contrary, its obligation was recognized and imposed by Mrs. McFarland upon Mr. Meeker, to whom she leased the foundry, and its benefits were accepted by the complainant from both Mrs. McFarland and Mr. Meeker, her transferee.

Long after the complainant had enjoyed the advice of counsel, as late as Easter Monday of 1901, he and his counsel used this contract to compel Mrs. McFarland to continue the complainant in her employ.   He continued so to use it while the bill in this case was being prepared, and kept on using it after the bill was filed on May 13th, and as late as July 2d, 1901, by a letter to Mrs. McFarland, the complainant tendered himself ready to perform his part of it.

Other conduct of the complainant is entirely inconsistent with the idea that Mr. McFarland ever made a binding contract to give the foundry and business to the complainant.   On February 10th, 1901, the complainant, as sworn appraiser, helped to make the inventory, which enumerated the foundry, tools and equipment as part of Mr. McFarland's personal estate.   On the 15th of February, 1901, the complainant suggested to Mrs. McFarland that he needed a power of attorney to enable him to conduct the business for her, and she, as owner of the foundry, gave him one, authorizing him to carry it on for her in the name of the "Estate of William McFarland."

She continued to furnish funds to the complainant and to direct the conduct of the business which he carried on for her. She wrote to the complainant on the 13th day of March, 1901, stating that someone had applied to her to see if she would sell the foundry.   She received applicants for the purchase of it, who were shown over the premises in the presence of Mr. Wolfinger without a suggestion at any time that he claimed any rights in the property.   Wolfinger spoke to Mrs. McFarland of these possible purchasers of the foundry, and said that it was foolish for her to sell it.   He was extremely desirous that she should make no sale of it, and that he should be continued in her employment as manager.

In the month of March, 1901, Mrs. McFarland had caused an examination to be made of the books at the foundry and became dissatisfied with Mr. Wolfinger's method of conducting the business. She forgot the contract of January 14th, 1901, and on Easter Monday (the 8th day of April, 1901) she attempted to discharge him by a summary notice. He and his counsel at once confronted her with that contract, by which, as owner of the foundry and business, she had contracted to employ Mr. Wolfinger as her manager for the term of five years. Wolfinger and his counsel threatened Mrs. McFarland with a suit for damages if she persisted in her attempts to discharge him. They used the contract, which they now insist Mrs. McFarland led Wolfinger to make, to compel her to continue to act as the owner of the foundry and business and to retain the complainant as her employe in that business. Mrs. McFarland accepted the inevitable. She withdrew her notice of the discharge of the complainant and continued him in her employ at the wages provided for in the contract.

For three months after Mr. McFarland's death and for more than two months after Wolfinger knew Mr. McFarland had given the foundry and business to Mrs. McFarland, Mr. Wolfinger had seen Mrs. McFarland continue to act as the owner of that property; had himself contracted with her as the owner; had compelled her to recognize that contract; had participated in transactions based on her ownership, which necessarily called for expenditures of money and the assumption of contractual obligations by her; and he never, in all that time, in any way asserted that he had any such claim as he now sets up in his bill of complaint.

I am presently considering the complainant's attitude not with relation to the working of an estoppel because of his silence when he should have spoken, but as to its indications that in truth there never was any contract between him and the decedent, Mr. McFarland, whereby the latter agreed for a consideration to convey or devise the foundry and business to the complainant. If there was in fact any contract between the decedent, McFarland, and Wolfinger to that effect, the latter

must have been aware of it during all the transactions in which he recognized Mrs. McFarland as the owner of that property. Had there been such an agreement it would have been the most reasonable and natural thing for Mr. Wolfinger, in his own defence, to have disclosed it to Mrs. McFarland.

I am constrained to believe that the reason Mr. Wolfinger did not mention any such claim to her was, that in truth there never was any contract between himself and Mr. McFarland. What had taken place between them was merely a promise to make a gift, and Wolfinger, on finding that Mr. McFarland had changed his mind, obtained from Mrs. McFarland the contract of January 14th, 1901, as the best thing he could do to take care of his own interests. He had relied upon Mr. McFarland's kindly consideration for him. He believed and expected that he would be remembered by way of gift in his will, and when he found he was not, he accepted the disappointment as conclusive.

The complainant's subsequent claim is an afterthought, encouraged by the discovery that Mr. McFarland had told many people that he intended to give the foundry and business to him. Mr. McFarland is dead; he cannot state his side of this controversy. It is not to be presumed, without proof, that he deliberately perpetrated a fraud upon a faithful employe by breaking his contract with him. But it can readily be believed that his desire to care for his new wife might have led him to change his previous purpose to make a generous gift to such an employe.

Giving to all of the evidence, affirmative and negative, its full significance, it is not sufficiently shown that Mr. McFarland made any contract to convey or devise the foundry and business to the complainant to entitle the complainant to a decree for specific performance.

In addition to the failure to prove the undertaking of a contractual obligation, the complainant's evidence is too uncertain, in defining the terms of the alleged agreement, to be the basis of a decree for specific performance. It is entirely settled that in order to enforce specific performance of a contract which

is within the statute of frauds on the ground of part performance, the parol agreement relied on must be certain and definite in its terms. *Brown* v. *Brown, 33 N. J. Eq. (6 Stew.) 651* (*Court of Errors and Appeals*).

In the present case it has been shown that Mr. McFarland, in his lifetime, conducted a machine shop and foundry business. The machine shop and the foundry adjoined each other. The bill of complaint alleges that the decedent agreed to give the complainant "his foundry business, with all tools, machinery, appliances, appurtenances and everything belonging thereto or used in connection therewith." The bill assumes that this alleged contract affected not only the foundry business and its equipment, but also the lot of land and real estate upon which it was conducted. A metes and bounds description of the Breunig street lot of land is recited in the bill. Some of the witnesses say that Mr. McFarland stated that he was to give the complainant the "foundry," some of them that it was the "business," some of them the "factory and business." Nothing that Mr. McFarland said in the repeated admissions mentioned any land as intended to be included in his gift to the complainant, except as the word "foundry" might mean land. Nothing in his alleged admissions defined what land was included in the foundry. There has been no proof of anything said by Mr. McFarland which fixed a defined line where the machine shop and the foundry (admittedly located immediately adjoining each other) separate. It has not been shown what was included within the word "business," as alleged to have been used by the complainant. It is indeed one of those things, as the witness Lafetra described it, "which might be construed in a good many ways." These definitions of the alleged subject-matter of the contract are too uncertain.

In the foregoing review of this case I have not considered the element of estoppel, which is insisted upon by the defendants with great force, to the effect that the complainant is estopped by his own conduct from asserting himself to be the purchaser of the foundry.

As this point is presented by the defendant Meeker, it appears to have less strength than as put forward by the defendant Mrs. McFarland. It is shown that before Mr. Meeker had entered into any binding contract for the purchase of the foundry, and before he had paid any part of the purchase-money, he was fully notified of the complainant's claim upon the foundry and business. Mr. Meeker, in subsequently leasing and taking an agreement to purchase, took the risk that the complainant's claim might be successfully asserted. Mr. Meeker, however, alleges that as to him the complainant has waived and abandoned his claim by accepting service under his five-year contract with Mrs. McFarland after it had been transferred to Mr. Meeker. It is in proof that Mr. Wolfinger, having contracted with Mrs. McFarland, as owner of the foundry and business, to work for her for five years as her employe in that business, did in fact accept Mr. Meeker as his employer in the foundry under the five-year agreement in Mrs. McFarland's place, while at the same time he was prosecuting the present suit which seeks to compel Mrs. McFarland and Mr. Meeker to convey the foundry and business to him as purchaser by a contract obligatory upon them. The two positions thus assumed by the complainant seem to be quite irreconcilable, but Mr. Meeker was in no way misled by anything done by the complainant in the premises. Mr. Meeker knew of the impending suit when he took his lease and option to purchase, and when he continued Mr. Wolfinger in his employ. The complainant has ever since, to Mr. Meeker's certain knowledge, actively prosecuted this suit, and, far from waiving or abandoning his claim, has diligently pushed it. Mr. Meeker has predicated no action upon Mr. Wolfinger's supposed waiver of his claim.

The complainant's relation to Mrs. McFarland on the charge that he is estopped is much more forceful. Assuming, for the moment, that there was in fact a contract between the complainant and Mr. McFarland in his lifetime that the latter should convey or devise the foundry and business to the complainant, it was necessarily within the complainant's knowledge.

Immediately after Mr. McFarland's death the complainant became acquainted with the fact that by his will Mr. McFarland had repudiated this contract, and had given the subject-matter of it to Mrs. McFarland. The complainant knew that she had accepted the gift and he had no reason to believe that she had any knowledge of his claim to that property—in fact she did not know of it.

With all this information the complainant, without disclosing his claim to Mrs. McFarland, advised and induced her to undertake the foundry business as owner of it, to spend money on account of it, to make contracts in the conduct of it (one of them with himself), and to change her position in a way which it is impossible to believe she would have done had she known that he claimed that he was himself the owner of the property. He actually accepted a power of attorney given by her as owner to carry on the business for her.

The complainant's counsel, recognizing the awkwardness of this situation, offer in the bill of complaint to release Mrs. McFarland from her contract (as owner) to employ the complainant for five years as manager, and to return what money she had or might pay him on account of that contract, upon terms that she should convey the foundry and business to him and account to him for the profits of the business up to that time. But the conduct of the business was not solely between Mrs. McFarland and the complainant. Her contract to employ him is but a small incident of the business. She took the property, it is true, as a volunteer, but the proof is that, believing herself to be the owner and knowing nothing of the complainant's claim, she, by the complainant's contrivance, advanced money and entered upon the conduct of the business. She may have, and it is entirely reasonable to believe that she has, in the conduct of the business, entered into other outstanding contracts than that with the complainant, possibly losing contracts. From these matters, the complainant makes no offer to relieve her.

If it be assumed that the complainant had the contract with Mr. McFarland alleged in his bill of complaint, he should be estopped to assert it as against Mrs. McFarland, after he had persuaded and induced her to enter upon the conduct of the foundry business without disclosing to her the fact that he had a contract which would take that business away from her. There is no difference, in principle, between his action and that of an intending purchaser who has obtained from an owner of lands a private contract to convey to him, and who, secreting the fact that he has such a contract, induces the heir or devisee of the owner to build on the lands.

The complainant has failed to present a case which entitles him to a decree for specific performance, as prayed for in his bill of complaint.

I will advise a decree that the bill be dismissed, with costs.

*Mr. Carroll Robbins* and *Mr. Robert S. Woodruff*, for the appellant.

*Mr. James Buchanan*, for the respondents.

PER CURIAM.

The decree in this cause is affirmed, for the reasons given by Vice-Chancellor Grey in the court below.

*For affirmance*—DIXON, GARRISON, FORT, HENDRICKSON, PITNEY, SWAYZE, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY —11.

*For reversal*—None.